[Cite as *Sun Bldg. Ltd. Partnership v. Value Learning & Teaching Academy, Inc.*, 2021-Ohio-2008.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| SUN BUILDING LIMITED PARTNERSHIP, et al., | : | APPEAL NO. C-180244 TRIAL NO. A-1404504 |
| | : | |
| Plaintiffs, | | |
| | : | *O P I N I O N.* |
| and | | |
| | : | |
| OHIO ATTORNEY GENERAL, | | |
| | : | |
| and | | |
| | : | |
| OHIO DEPARTMENT OF EDUCATION, | | |
| | : | |
| Intervenors-Plaintiffs-Appellees, | : | |
| | : | |
| vs. | | |
| | : | |
| VALUE LEARNING & TEACHING ACADEMY, INC., d.b.a. VLT ACADEMY, et al., | : | |
| | : | |
| Defendants, | | |
| | : | |
| and | : | |
| VALERIE LEE, | : | |
| CLYDE LEE, | : | |
| and | : | |
| ECHOLE HARRIS, | : | |
| Defendants-Appellants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal:  June 16, 2021

*Dave Yost*, Ohio Attorney General, and *Todd R. Marti*, Assistant Attorney General,
for Intervenors-Plaintiffs-Appellees,

*Bruns, Connell, Vollmar & Armstrong, LLC, Thomas B. Bruns* and *Lucinda C.
Shirooni,* for Defendants-Appellants.

**BERGERON, Judge.**

{¶1}    In this debacle concerning the collapse of a community school (also known as a charter school), the superintendent ran the school into the ground, but managed to enrich herself and her family along the way.  Not only were public funds squandered in this fiasco, but the scandal detrimentally impacted the lives of countless children, often from disadvantaged backgrounds.  Ohio law imposes stiff penalties on its public officials for having a personal financial interest in the transactions of their public offices, and in the wake of the school's insolvency, this action involves the Ohio attorney general's efforts to hold the superintendent and her family accountable.

{¶2}    After a trial on a stipulated record, the trial court found the superintendent strictly liable for the amounts of the conflicted transactions, and also determined that all the family members should relinquish their wages.  Relatedly, the court held that the contracts between the school and the superintendent's husband's company constituted a pattern of corrupt activity, imposing treble damages.  Ultimately, we affirm the strict liability claim against the superintendent and the reclamation of the family's wages.  However, we disagree with the trial court's holding that the contracts with the husband's company constituted a pattern of corrupt activity, and we reverse the liability determination and damages under Ohio's racketeering statute.

I.

{¶3}    In 2005, defendant-appellant Valerie Lee launched a community school (a publicly funded charter school) in the Cincinnati area—Value Learning & Teaching Academy (VLT).  Located in the Over the Rhine neighborhood in the urban

3

core of Cincinnati, VLT aimed to provide underprivileged children with a premier education. The public funding of the school also brought oversight by the Ohio Department of Education and the state auditor. VLT ultimately failed to live up to its lofty aspirations, plunging headlong into difficulty, both educationally and financially. During its relatively short existence, VLT witnessed its students decline in their testing scores, emblematic of a crisis in its academic efforts. Nor did VLT fare any better financially. Although it passed its financial reviews with the state auditor, it began incurring multimillion dollar operating losses that would prove the death knell for the school's existence.

{¶4} VLT eventually sputtered into insolvency, closing its doors in 2014, which prompted its landlords to sue for unpaid rent. As part of that suit, the landlords brought claims against VLT, its sponsor, and various school personnel in their personal capacities. The landlords alleged, among other things, that these individuals bore personal liability for VLT's obligations because they participated in conflicted transactions, in derogation of public finance laws.

{¶5} This suit soon attracted the state's attention, as the Ohio Department of Education and the attorney general intervened on VLT's behalf, arguing that the state's involvement was necessary to protect the public's interest in recovering public assets. The state also took the position that VLT personnel were immune (as public officials) from the landlords' suit and that VLT's assets (as a publicly-funded school) should be distributed according to relevant statutes instead of divvied up by the landlords. Ultimately, the trial court agreed, holding that the landlords lacked standing to recover public funds for their private use or to bring claims against VLT staff. As a result, despite affirming VLT's obligations to its landlords, the court

4

allocated asset distribution preference to former teachers and administrators for unpaid wages and retirement contributions. The landlords appealed that judgment, and we affirmed. *See Sun Bldg. Ltd. Partnership v. Value Learning & Teaching Academy, Inc.*, 1st Dist. Hamilton Nos. C-160789 and C-160793, 2017-Ohio-8727.

{¶6} Following our decision, the attorney general pursued many of the claims against VLT personnel. As relevant for this appeal, the attorney general specifically sought to recover from Ms. Lee and her husband and daughter (the "Lees"), because of their involvement with VLT. As already noted, Ms. Lee served as the superintendent. However, her husband, Clyde Lee, also worked for VLT as its project manager—a position he held from 2008 until 2014, when it closed. And Ms. Lee's daughter, Echole Harris, worked for VLT in various capacities from 2006 until its closure. As employees of a publicly funded institution, the Lees constituted public officials under the relevant statutes, and the attorney general alleged that they violated Ohio law by possessing a personal interest in two sets of VLT's transactions.

{¶7} The first set of transactions involved multiple contracts between VLT and an entity called CEED, Inc., for janitorial and maintenance services. These arrangements attracted scrutiny because Mr. Lee was the sole owner of CEED. As a result of owning CEED, the attorney general alleged that his interest in those contracts violated Ohio law based on his status as an employee of VLT. Further, the attorney general highlighted Ms. Lee's personal interest in the CEED contracts because she was an authorized user on its bank account. She transferred funds from CEED's account into her personal account and sometimes routed CEED payments straight to herself. Having determined that this scenario created a conflict of interest with respect to the CEED contracts, the trial court imposed two types of civil

5

penalties against Mr. and Ms. Lee. The court first determined that they should forfeit all employment wages they received during the relevant time periods, under the faithless servant doctrine. The court also held both of them liable under the Ohio Corrupt Practice Act (OCPA) for treble damages.

{¶8} As to the second set of transactions, the attorney general characterized the daughter's employment contracts as illegal. Here, though, only Ms. Lee possessed the potentially illegal interest because she co-owned the bank account where VLT deposited her daughter's wages. The trial court therefore held that Ms. Lee's illegal interest rendered the daughter's contracts void and unenforceable, and as a result, concluded that Ms. Harris should forfeit those wages.

{¶9} Finally, pertaining to both sets of transactions, the trial court held Ms. Lee strictly liable by virtue of her position as superintendent. Ms. Lee's name appeared on VLT's bank account that received public funds, and she also shared responsibility for managing those funds. Thus, the court concluded that Ms. Lee assumed responsibility for the entire amounts of VLT's contracts with CEED and her daughter.

{¶10} In sum, the trial court determined that Ms. Lee's liability amounted to $6,132,071.24[1]: $887,441.46 for her forfeited wages (faithless servant doctrine); $328,188.38 for her daughter's wages (strict liability); and $5,096,441.40 for the CEED contracts ($1,694,973.84 under strict liability, overlapping with treble damages under the OCPA). The court held Mr. Lee liable for $5,448,520.23:

---

[1] We note that, due to typographical or computation error, the judgment amounts are inconsistent. For example, the sum of Ms. Lee's judgments actually equal $6,312,071.24, instead of $6,132,071.24. Furthermore, the OCPA judgment against Mr. and Ms. Lee for $5,096,441.40 is inconsistent with the court's prior evaluation of $5,084,921.52. *See* paragraphs 142 and 143 of the trial court's judgment entry.

$352,078.83 for his forfeited wages (faithless servant doctrine); and $5,096,441.40, jointly and severally with Ms. Lee for triple the CEED contracts under the OCPA. Finally, the court held Ms. Harris liable for $328,188.38, jointly and severally with Ms. Lee, for the value of her employment contracts that the court deemed void and unenforceable.

{¶11} The Lees now appeal, presenting seven assignment of error, challenging the judgments against them and the attorney general's authority to sue in the first place. We note, however, that the trial court's factual determinations are not at issue because the parties presented joint stipulations instead of convening an in-person trial. Therefore, we review the trial court's conclusions de novo. *See Brown v. Gallagher*, 2013-Ohio-2323, 993 N.E.2d 415, ¶ 7 (4th Dist.) ("Review of a trial court's application of the law to stipulated facts is de novo.").

## II.

{¶12} The Lees first challenge the case against them—in its entirety—by maintaining that the attorney general lacked the authority to prosecute these claims in the first place. In their first two assignments of error, the Lees posit that the attorney general had neither statutory standing nor common law standing because the state auditor failed to issue a "finding for recovery." Ultimately, we conclude that the attorney general enjoys statutory standing, rendering it unnecessary to address the parameters of his common law authority.

{¶13} To fully understand the Lees' challenge to the attorney general's authority, we provide a little background on community schools. In 1997, the General Assembly passed charter-school legislation, known as the Community Schools Act and codified under R.C. Chapter 3314. *See State ex rel. Rogers v. New*

7

*Choices Community School*, 2d Dist. Montgomery No. 23031, 2009-Ohio-4608, ¶ 32; R.C. 3314.01. The act was designed to " 'provid[e] parents a choice of academic environments for their children and provid[e] the education community with the opportunity to establish limited experimental educational programs in a deregulated setting.' " *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 6, quoting Am.Sub.H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 2043. To achieve that goal, the General Assembly created "community schools," which are privately run public schools, not part of any school district, but funded by the state as part of the Department of Education. *See id.* at ¶ 7; R.C. 3314.01, 3314.02(B) and (C)(1), 3314.08(C), and 3314.082.

{¶14} To provide flexibility, community schools are exempt from some Ohio laws and regulations, but they must nonetheless meet state academic standards and comply with extensive guidelines set forth in R.C. Chapter 3314. *See Congress of Parents & Teachers* at ¶ 7. For example, community schools can be formed only as nonprofit or public-benefit corporations, R.C. 3314.03(A)(1); cannot charge tuition, R.C. 3314.08(F); cannot be sectarian, R.C. 3314.03(A)(11)(c); and must obtain and be answerable to a sponsor, R.C. 3314.03(A)(4). And importantly, for purposes of this appeal, community schools are also subject to oversight by the state auditor. R.C. 3314.03(A)(8); *New Choices* at ¶ 64.

{¶15} R.C. 3314.03(A)(8) requires community schools to maintain their "financial records * * * in the same manner as are financial records of school districts, pursuant to rules of the auditor of state." Furthermore, those financial records are subject to routine review by the auditor, pursuant to R.C. Chapter 117.

8

*See* R.C. 3314.03(A)(8); *New Choices* at ¶ 63. As part of that process, the state auditor must determine "whether any public money has been illegally expended, any public money collected has not been accounted for, any public money due has not been collected, or any public property has been converted or misappropriated." R.C. 117.24. The state auditor must then issue a report that incorporates his findings. *See* R.C. 117.25. If the auditor's report observes a misappropriation of public funds, *see* R.C. 117.28, that determination is often referred to as a "finding for recovery." *See, e.g., DeMastry v. Warden*, S.D.Ohio No. 205-CV-267, 2007 WL 869695, *36 (March 20, 2007) ("[P]ursuant to R.C. 117.28, the Attorney General * * * asserted to the auditor's findings for recovery * * * ."); 1994 Ohio Atty.Gen.Ops. No. 94-048, at 2-244.

{¶16} Furthermore, R.C. 117.27 requires the state auditor to file a copy of his report "with the officer required * * * to act as legal counsel to the officers of the public office * * * * [or] the prosecuting attorney of the county within which the fiscal office of the public office is located." And if the report concludes that "public money has been illegally expended * * *, not been accounted for * * *, not been collected, or that any public property has been converted or misappropriated," the auditor must also notify the attorney general. R.C. 117.28. Finally, if the officer receiving the report fails to pursue legal action within 120 days to reclaim the misappropriated funds, "[t]he attorney general may bring the action * * * ." *Id.*

{¶17} Returning to the case at hand, the Lees attempt to fashion R.C. 117.28 into a golden shield by arguing that it represents the exclusive means by which the attorney general can obtain standing in pursuit of public officials associated with a community school. And because the state auditor issued no finding for recovery

here, the Lees insist that the statute precludes the attorney general from suing. For his part, the attorney general seeks to bypass R.C. 117.28 altogether, explaining that a different provision—R.C. 117.42—bequeaths upon him broad authority to sue. That statute provides in relevant part:

> Upon request of the auditor of state, the attorney general may file and prosecute to judgment or decree appropriate actions to prevent the unlawful expenditures of public funds, cancel contracts not made in compliance with law, enforce liabilities arising from false certifications or failure to furnish financial reports, secure compliance with this chapter, secure compliance with fiscal, accounting, or budgeting requirements, opinions, or adjustments made in an audit report, secure compliance with the laws, ordinances, rules, and orders pertaining to any public office, and enforce generally the laws relating to the expenditure of public funds.

R.C. 117.42.

{¶18} As they traverse the statutory sections here, the Lees broadly argue that R.C. 117.42 and 117.28 (authority pursuant to a finding for recovery) operate exclusively from each other. More specifically, they first explain that R.C. 117.42 applies only to so-called unauditable entities (which would not include VLT). And second, as noted above, they portray R.C. 117.28 as the exclusive remedy against auditable community schools (which does include VLT). We address each argument in turn.

A.

**{¶19}** To show why the attorney general cannot obtain standing under R.C. 117.42, the Lees argue that another provision—R.C. 117.41—limits its scope to unauditable entities. To be sure, R.C. 117.41 deals with unauditable entities: those that the state auditor declares incapable of being properly reviewed "because its accounts, records, files, or reports have been improperly maintained." R.C. 117.41. And as the Lees point out, R.C. 117.41 further provides that "the auditor of state shall request legal action *pursuant to section 117.42* * * * to compel the public office to bring its accounts, records, files, or reports into an auditable condition." (Emphasis added.)

**{¶20}** Of course, R.C. 117.41 is not relevant to this case as no party contends that VLT qualified as "unauditable." Moreover, the statute under which the attorney general rests his authority—R.C. 117.42—makes no reference to R.C. 117.41, unauditable entities, or otherwise includes such limiting language. Much to the contrary, it paints with a broad brush, delineating fairly extensive authority possessed by the attorney general (as quoted above).

**{¶21}** Nevertheless, to justify limiting R.C. 117.42 to unauditable entities, the Lees frame R.C. 117.42 as in pari materia with R.C. 117.41—that is, pertaining to the same subject matter and so inextricably intertwined that they must be construed together. *See State ex rel. Gains v. Rossi*, 86 Ohio St.3d 620, 622, 716 N.E.2d 204 (1999). They likewise emphasize the fact that both statutes were promulgated at the same time. *See Evans v. Lawyer*, 123 Ohio St. 62, 68, 173 N.E. 735 (1930) ("[S]tatutes passed at or nearly the same time should be construed together in determining their effect."). In other words, the Lees reason that the interplay

between R.C. 117.41 and 117.42 demonstrates that the broad language in R.C. 117.42 is actually limited to the subject matter of R.C. 117.41—unauditable entities. We disagree.

{¶22} "When construing the language of a statute, we begin with a familiar objective: a determination of the intent of the General Assembly." *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office*, 152 Ohio St.3d 163, 2017-Ohio-8714, 94 N.E.3d 498, ¶ 14. And the Ohio Supreme Court has instructed that we " 'give effect to the legislature's intention' by looking at the language of the statute." (Internal citations omitted.) *Id.* at ¶ 15, quoting *Cline v. Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991). Thus, if the language of the statute is unambiguous, we have "no cause to apply the rules of statutory construction." *Id.*; *see Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8 ("We 'do not have the authority' to dig deeper than the plain meaning of an unambiguous statute 'under the guise of either statutory interpretation or liberal construction.' "), quoting *Morgan v. Adult Parole Auth.*, 68 Ohio St.3d 344, 347, 626 N.E.2d 939 (1994); *see also* R.C. 1.49 ("If a statute is ambiguous, the court, in determining the intention of the legislature, may consider * * * other matters.").

{¶23} This principle extends, of course, to the in pari materia rule of statutory construction. "[I]t is applied only 'where some doubt or ambiguity exists in the wording of a statute.' " (Emphasis omitted.) *Clay* at ¶ 17, quoting *State ex rel. Celebrezze v. Allen Cty. Bd. of Commrs.*, 32 Ohio St.3d 24, 27–28, 512 N.E.2d 332 (1987); *see Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, ¶ 22 (" 'The in pari materia rule of construction may be used in interpreting statutes where some doubt or ambiguity exists.' "), quoting *State*

*ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 585, 651 N.E.2d 995 (1995).  And "ambiguity in a statute exists only if its language is susceptible of more than one reasonable interpretation."  *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16.

**{¶24}**  Here, the Lees do not even attempt to portray R.C. 117.42 as ambiguous, and for good reason.  As noted above, it sets forth, in expansive language: "the attorney general may file and prosecute to judgment or decree appropriate actions to * * * secure compliance with the laws, ordinances, rules, and orders pertaining to any public office, and enforce generally the laws relating to the expenditure of public funds."  R.C. 117.42.  In contrast to R.C. 117.41, which addresses only unauditable entities, R.C. 117.42 encompasses a wider range of topics, and it does not hint at any restriction such as that imagined by the Lees.  In addition to covering laws regarding public offices and expenditures, the statute also addresses the misappropriation of public funds, unlawful contracts, false certifications, and compliance with state accounting requirements.  In sum, nothing about this extensive list embodied in R.C. 117.42—or the broad, generalized language used by the General Assembly—indicates that R.C. 117.42 is confined to unauditable entities.

**{¶25}**  The Lees also confuse the significance of R.C. 117.41's reference to R.C. 117.42.  As a general rule, where one statute "specifically cites another statute, it is 'incorporating by reference' the other statute, and the other statute must be considered in determining plain language."  *Citizens Bank, NA v. Leek*, 2018-Ohio-2813, 112 N.E.3d 471, ¶ 16 (7th Dist.), quoting *Gen. Motors Corp. v. Kosydar*, 37 Ohio St.2d 138, 146, 310 N.E.2d 154 (1974) ("[U]se tax statute, incorporates by reference the sales tax exceptions" in another statute).  But this incorporation

13

principle only points in one direction here—R.C. 117.42 contains no reference to R.C. 117.41.  And we are aware of no authority holding that an *incorporated* statute (here R.C. 117.42) should be interpreted through the lens of the *incorporating* statute (here R.C. 117.41).  Such an interpretive approach could lead to nonsensical results where a statute, such as R.C. 117.42, is referenced by many other statutes.

{¶26} Further illustrating this point, we note that in at least two other instances, the General Assembly explicitly utilized R.C. 117.42 to grant the attorney general authority without requiring a finding of unauditability.  *See* R.C. 3318.48(C) (providing that if a school district does not pay the Ohio facilities construction commission for its certificate of completion within 60 days, the auditor shall request legal action under R.C. 117.42); R.C. 124.181(N) (providing that R.C. 117.42 may be used to seek reimbursement from public employees for overpayments for salary adjustments or miscalculations of vacation time after expiration of a delineated grace period).  Such provisions simply cannot be reconciled with the Lees' statutory gloss.  Based on the plain language of the statute, nothing about the language of R.C. 117.42 suggests that the attorney general's authority under that provision is limited to unauditable entities.

### B.

{¶27}  Anticipating our refusal to confine R.C. 117.42 to unauditable entities, the Lees alternatively invite us to interpret R.C. 117.28 as specifically limiting the broad authority in R.C. 117.42.  More precisely, the Lees maintain that the attorney general can only seek authority to sue under R.C. 117.28 because VLT is an auditable entity.  We find this argument similarly unavailing.

{¶28} The Lees' fallback suffers from the same fate as their lead—the language of R.C. 117.28 does not contain the limitation that they pretend exists. It simply provides that if the officer receiving the auditor's report does not sue to recover misappropriated funds, within 120 days, "[t]he attorney general may bring the action." R.C. 117.28. Furthermore, even if the officer does file suit within 120 days, the attorney general may also "appear in any such action * * * in conjunction with or independent of the officer." *Id.* Thus, the attorney general's authority under R.C. 117.28 is entirely discretionary, and the statute contains no restrictions on his ability to sue. In other words, nothing in R.C. 117.28 suggests that it represents the exclusive remedy for auditable entities. *See Gibbs v. Greenfield Exempted Village School Dist. Bd. of Edn.*, 4th Dist. Highland No. 01CA8, 2001 WL 1674097, *8 (Dec. 24, 2001) ("This court has previously stated that R.C. 117.28 does not appear to provide the only means by which a board of education may recover funds.").

{¶29} The Lees' argument also runs afoul of the maxim that " '[p]ublic authorities have their option as to which sections they will utilize in protecting public money and public property.' " *State v. Johnson*, 6th Dist. Lucas No. L-81-151, 1981 WL 5432, *3 (Oct. 30, 1981), quoting *State ex rel. Smith v. Maharry*, 97 Ohio St. 272, 279, 119 N.E. 822 (1918). In *Johnson*, the Sixth District rejected a nearly identical exclusivity argument in the wake of a finding of deficiency for a former registrar for the Bureau of Motor Vehicles. *Id.* at *1. The registrar contended that the attorney general lacked standing to sue because he had not invoked his authority under R.C. Chapter 117. *Id.* The attorney general instead opted to sue under R.C. Chapter 115, which provided "broad and general" rules by which claims "may be certified to the state auditor and attorney general for collection." *Id.* at *2, *3. As a result, the

15

registrar argued—just as the Lees echo here—that the more specific provision constituted the exclusive remedy available to the attorney general. *Id.* at \*2. The Sixth District disagreed, reasoning that nothing about the two sections suggested they were mutually exclusive, leaving the attorney general free to proceed under any applicable provision. *Id.* at \*3. We find the Sixth District's reasoning in *Johnson* persuasive, and similarly hold that R.C. 117.28 and 117.42 are not mutually exclusive. The attorney general may thus avail himself of either, so long as it applies to the case at hand.

{¶30} The Lees nonetheless attempt to narrow their argument by responding that the statutory scheme for *community schools* impliedly limits the attorney general to recovery under R.C. 117.28. As noted above, R.C. 3314.03(A)(8) requires the state auditor to review community schools in accordance with R.C. Chapter 117. But if the community school is unauditable, R.C. 3314.51(E) specifically provides that the auditor may request legal action under R.C. 117.41 and 117.42. Thus, the Lees argue that the General Assembly anticipated that actions against *auditable community schools* would be brought pursuant to only a finding for recovery under R.C. 117.28. But the constraint that they imagine is simply not reflected in the statutory landscape, and thus we find this argument without merit. Undoubtedly, the General Assembly anticipated multiple methods for the attorney general to sue regarding a wayward community school, all of which militates in favor of the *Johnson* rule. Even in the context of community schools, "we find that the statutory sections \* \* \* by which actions to recover losses of public funds may be instituted are not mutually exclusive[,] and the state may proceed under any section applicable to the case." *Johnson* at \*3.

16

{¶31} Finally, citing *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, the Lees offer up a rejoinder that not viewing R.C. 117.28 as exclusive would render the section superfluous. *See id.* at ¶ 26 (" 'No part should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative.' "), quoting *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917). They warn that if the auditor can ask the attorney general to sue an auditable entity (under R.C. 117.42) without making a finding for recovery, the auditor can simply bypass the requirements of R.C. 117.24 et seq. altogether.

{¶32} In *D.A.B.E.*, the Ohio Supreme Court addressed whether a local health board could prohibit smoking in all public places in the county. *Id.* at ¶ 14. The health board looked to the language of R.C. 3709.21, which provided that "[t]he board of health * * * may make such orders and regulations as are necessary * * * for the public health." *Id.* at ¶ 18. Despite this plain, broad language, the court held that such language could not support the smoking ban because "the General Assembly has explicitly and in great detail identified specific areas where local boards of health have substantive regulatory power to address public-health issues." *Id.* at ¶ 23. To hold otherwise, the court reasoned, would make all the specific grants of authority, including "entire sections of R.C. Title 37, as well as other provisions, * * * superfluous." *Id.* at ¶ 25.

{¶33} But we fail to see how *D.A.B.E.* aids the Lees here. The statutory scheme in *D.A.B.E.* contained a broad grant of regulatory power but then proceeded to provide many specific delineations of that authority. In contrast, neither R.C.

17

117.28 nor the statutory scheme for community schools contains any specific delineation of the *attorney general's* authority. R.C. 117.24 et seq. provides the process by which the *auditor* shall review public entities and make findings for recovery. And R.C. Chapter 3314 provides guidelines for *community schools*. In short, the Lees point to nothing in these provisions that suggests the General Assembly sought to limit the *attorney general's* authority to sue auditable community schools, particularly given the expanse of R.C. 117.42.

{¶34} Furthermore, the Lees' fear of superfluity for R.C. 117.28 is misguided. For one, this reasoning misses the obvious point that, as a practical matter, routine audits are the primary way by which the state auditor will unearth wrongdoing. But most importantly, just because the state auditor may have multiple arrows in his quiver does not mean the auditor can shrug off his duties under R.C. 117.24 et seq. as discretionary. *See* R.C. 117.24 ("The auditor of state *shall* analyze the report of the public accountant who has audited a public office to determine whether any public money has been illegally expended * * * .") (Emphasis added.)

{¶35} In sum, we hold that the attorney general has standing under R.C. 117.42 to sue public officials, even absent a finding for recovery under R.C. 117.28. R.C. 117.42 provides a broad grant of authority to "enforce generally the laws relating to the expenditure of public funds." And nothing in R.C. 117.28 or the statutory scheme governing community schools otherwise limits that authority. We therefore overrule the Lees' first assignment of error challenging the attorney general's statutory authority; and we accordingly find their second assignment of error, challenging the attorney general's common law standing, moot.

### III.

{¶36} In their fourth, sixth, and seventh assignments of error, Mr. and Ms. Lee contest both the trial court's finding of illegality of the CEED contracts and the interplay between those transactions and their liability. Based on their personal interests in the CEED contracts, the court held them liable under the faithless servant doctrine for the value of their wages during the relevant time period, and imposed treble damages for the contracts' value under the OCPA. We first address the trial court's illegality determination before addressing Mr. and Ms. Lee's liability under the faithless servant doctrine and the OCPA.

### A.

{¶37} R.C. 2921.42 makes it a first degree misdemeanor for any public official to "knowingly * * * [h]ave an interest in the profits or benefits of a public contract entered into by or for the use of the political subdivision or governmental agency or instrumentality with which the public official is connected." R.C. 2921.42(A), (A)(4), and (E).

{¶38} The Lees do not contest whether the elements of R.C. 2921.42(A)(4) are satisfied. By virtue of their employment with VLT, Mr. and Ms. Lee constituted public officials for purposes of the statute. *See Cordray v. Internatl. Preparatory School*, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 24 ("[A]n officer, employee, or duly authorized representative of a community school is a public official * * * ."), citing R.C. 117.01(E) ("Public official" means any officer, employee, or duly authorized representative or agent of a public office."). Based on that predicate, the trial court held that they possessed an illegal interest in the CEED contracts because Mr. Lee owned CEED and because Ms. Lee was an authorized user

19

on CEED's bank account. See Ohio Ethics Commission, Advisory Opinion No. 93-001, at 8 ("A public official occupies a position of profit in a public contract when he will realize a pecuniary advantage, gain, or benefit, which is a definite and direct result of the public contract."); Ohio Ethics Commission, Advisory Opinion No. 89-008, at 3 ("[A]n employee is considered to have an interest in his employer's contracts if * * * he receives a share of the contract's proceeds in the form of a commission or fee [or] his employment responsibilities include participation in the administration or execution of the contract."); Ohio Ethics Commission, Advisory Opinion No. 93-008, at 3 ("The word 'interest' is defined * * * as 'a right to have the advantage accruing from anything.' "), quoting Black's Law Dictionary 729 (5th Ed.1979). The CEED contracts were also public contracts entered into by a political subdivision. *See* R.C. 2921.42(I)(1)(a) (providing that a "public contract" includes "a contract for the purchase or acquisition, of property or services by or for the use of * * * [a] political subdivision[]."); R.C. 2744.01(F) (" 'Political subdivision' or 'subdivision' means a * * * school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state."); R.C. 3314.082 ("A community school shall be considered a school district * * * ."); *Greater Hts. Academy v. Zelman*, 522 F.3d 678, 680 (6th Cir.2008) ("[C]ommunity schools are political subdivisions of [Ohio].").

{**¶39**} Instead of disputing these elements, the Lees focus their attention on subsection (C) of R.C. 2921.42. This subsection carves out an exception if four criteria are met:

(1) The subject of the public contract is necessary supplies or services

* * * ;

20

(2) The supplies or services are unobtainable elsewhere for the same or lower cost * * * ;

(3) The treatment accorded the political subdivision or governmental agency or instrumentality is either preferential to or the same as that accorded other customers or clients in similar transactions; [and]

(4) The entire transaction is conducted at arm's length * * * .

R.C. 2921.42(C).

**{¶40}** Here, the trial court issued alternative holdings on the subsection (C) exception. The court first concluded that the exception represents an affirmative defense and that the Lees did not satisfy their burden. In the alternative, the court held that the undisputed facts precluded them from satisfying the third element of the exception. Mr. and Ms. Lee challenge both findings on appeal.

**{¶41}** We first consider the affirmative defense point. The General Assembly determines the burdens of production and persuasion that rest on each party. *See* R.C. 2901.05. And the version in effect for this case provided: (1) "the burden of proof for all elements of the offense is upon the prosecution"; and (2) the burdens of production and proof for an affirmative defense rest upon the defendant. *See* former R.C. 2901.05(A). An affirmative defense is either: (1) "[a] defense expressly designated as affirmative"; or (2) "[a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." *Id.* at (D)(1). The R.C. 2921.42(C) exception is not expressly designated as affirmative. Thus, the question becomes whether the exception is "an excuse or justification peculiarly within the knowledge of the accused." *See* former R.C. 2901.05(D)(1).

21

{**¶42**} The attorney general primarily relies on *State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235, 694 N.E.2d 1356 (1998), in which the Ohio Supreme Court appeared to place the burden of proving the subsection (C) exception on the public official invoking it. *See id* at 243 ("The * * * Public Defender has fallen substantially short of satisfying the stringent four-part test set forth by R.C. 2921.42(C)."). In *Mallory*, the court sifted through a public-employment dispute involving an attorney that worked for a private, non-profit, public defender organization. *Id.* at 237. The attorney argued that she was a public employee (and should receive Ohio retirement benefits) because the county created the organization and the county public defender managed it. *Id.* at 238, 240. The public defender disputed the attorney's public employee status because he (the public defender) had authority to contract with a private organization. *Id.* at 242. As relevant here, the Supreme Court found the public defender's argument unavailing because, had such a contract actually existed, it would have violated R.C. 2921.42's prohibition against self-interested transactions. *See id.* ("[A] clear conflict of interest would have existed if [the public defender], acting in his official capacity * * * was permitted to determine the adequacy of services provided to the county by the 'private agency' [he] himself directed.").

{**¶43**} To avoid this conclusion, the public defender also invited the application of the subsection (C) exception. *Id.* at 242–43. And in response, the court concluded that he had "fallen substantially short" of proving that exception because he had "made no showing, beyond mere assertions." *Id.* at 243. While we recognize that the issue whether R.C. 2921.42(C) is an affirmative defense was not

22

squarely before it, the court nonetheless repeatedly treated it as a burden borne by the party invoking the exception.

{¶44} For their part, the Lees counter with *State v. Nucklos*, 121 Ohio St.3d 332, 2009-Ohio-792, 904 N.E.2d 512, as militating in favor of a conclusion that subsection (C) is an element of the offense that the attorney general must prove. The *Nucklos* court considered whether the state bore the burden to prove a health-professional exception to a drug trafficking statute. *Id.* at ¶ 1. This drug statute provided that it does not apply to licensed health professionals who comply with applicable regulatory standards. *Id.*; *see* R.C. 2925.03. And like the exception in this case, the statute in *Nucklos* did not indicate whether the health-professional exemption is an affirmative defense. *Nucklos* at ¶ 14. Nonetheless, the Supreme Court held that a health professional's noncompliance (with regulatory standards) represented an element of the offense, largely for two reasons. First, compliance was not peculiarly within a health professional's knowledge because Ohio's administrative code requires extensive documentation to maintain such compliance. *Id.* at ¶ 16. Second, the court reasoned that had the General Assembly intended to make the exception an affirmative defense, it could have stated that a compliant health professional is "excused" or "justified." *Id.* at ¶ 18. Instead, the General Assembly used the phrase "this section does not apply." *Id.* at ¶ 12, 18.

{¶45} Contrary to the Lees' assertion, we conclude that *Nucklos's* reasoning weighs in favor of finding that subsection (C) is an affirmative defense. To be sure, subsection (C), like the provision in *Nucklos*, begins with "this section does not apply" and does not provide that public officials are "excused" or "justified." *See* R.C. 2921.42(C). But unlike the *Nucklos* exception, conformity with subsection (C)

23

cannot be proven by referring to submitted documentation or other evidence readily within the state's grasp. In fact, all four of the subsection (C) elements rest peculiarly within the defendant's knowledge. Only the public official (or maybe others acting in concert with him or her) can know whether the services were necessary, whether the services were unobtainable elsewhere for the same or lower cost, whether the entire transaction was conducted at arm's length, and whether the public office received less-preferential treatment.

{¶46} Furthermore, other Ohio authorities have generally concluded that the party invoking subsection (C) carries the burden of proving it. We first note that the Seventh District assumed as much. *See State v. Mieczkowsk*, 2018-Ohio-2775, 115 N.E.3d 758, ¶ 79 (7th Dist.) (stating that the "[defendant] had * * * to prove the [R.C. 2921.42(C)] affirmative defense"). And the Ohio Ethics Commission has repeatedly determined that an official relying on subsection (C) has the burden of proving compliance. *See* Ohio Ethics Commission, Advisory Opinion No. 95-004, at 4 ("In order to meet the exemption provided by R.C. 2921.42 (C), four requirements must be met, and a public official must demonstrate compliance with all of those requirements."); Ohio Ethics Commission, Advisory Opinion No. 2008-04, at 3 ("The [subsection (C)] criteria are strictly construed against the public official who must show compliance with them."); Ohio Ethics Commission, Advisory Opinion No. 93-008, at 4 ("R.C. 2921.42(C) establishes four requirements, and a school board member must demonstrate compliance with all of those requirements before his minor child may be hired by the board of education."). Finally, we note that Ohio's pattern jury instructions reinforce the same viewpoint. *See* Ohio Jury Instructions, 2 CR Section 521.42 (Rev. Jan. 22, 2011) ("The Committee believes [R.C. 2921.42(C)] is

24

an affirmative defense under R.C. 2901.05(C)(2) or in the nature of an affirmative defense and must be treated as such.").

{¶47} While none of the authorities in the prior paragraph binds us, we find them instructive in light of the Supreme Court's reasoning in *Mallory* and *Nucklos.* Based on the structure of the statute and the weight of Ohio legal authority, we therefore hold that R.C. 2921.42(C) is an affirmative defense within the definition in R.C. 2901.05(D)(1)(b). It is "an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." *See* R.C. 2901.05(D)(1)(b). Thus we conclude that the trial court did not err by placing the burden of proving the subsection (C) exception on the Lees.

{¶48} We now turn to consider whether Mr. and Ms. Lee satisfied their burden here. That inquiry need not detain us long because, as the trial court noted, the Lees "failed to come forward with any briefing or authority on [subsection (C)'s] applicability." In short, just as in *Mallory*, Mr. and Ms. Lee "made no showing, beyond mere assertions." *See Mallory*, 82 Ohio St.3d at 243, 694 N.E.2d 1356. In light of the failure to attempt to carry their burden, we conclude that Mr. and Ms. Lee could not avail themselves of the exception embodied in R.C. 2921.42(C).

{¶49} Even if the state bore the burden under (C), we also agree with the trial court's alternative holding that the undisputed facts precluded the Lees from satisfying the third element, which provides: "The treatment accorded the political subdivision or governmental agency or instrumentality is either preferential to or the same as that accorded other customers or clients in similar transactions." R.C. 2921.42(C)(3).

25

{¶50}  The trial court reasoned that Mr. and Ms. Lee could not satisfy this element because CEED had no other customers.  In other words, Mr. Lee created this entity to do business with only VLT and benefit from his inside relationship with Ms. Lee.  For their part, the Lees attempt to turn the trial court's reasoning on its head by insisting that the third element was met *precisely because* CEED had no other customers.  In other words, they maintain that it was legally impossible for CEED to give less-preferential treatment to VLT.  But this reasoning runs roughshod over the purpose underlying the exception.  The thrust of subsection (C) is to ensure that in the event conflicted transactions are necessary, they are nonetheless transparently fair to the public's interest.  And the General Assembly provided the preferential-treatment standard as a key benchmark to evaluate that fairness.  Here, because CEED had no other customers, it could not satisfy R.C. 2921.42(C)(3).  *See, e.g., Mieczkowsk*, 2018-Ohio-2775, 115 N.E.3d 758, at ¶ 121 (holding that defendant failed to satisfy third element where only one transaction occurred and there were no "similar transactions" to evaluate).  We decline the invitation to enable a captive company, created by an insider, to evade scrutiny in this manner.

{¶51}  For all of these reasons, we conclude that Mr. and Ms. Lee violated R.C. 2921.42 by having an interest in VLT's contracts with CEED and overrule their fourth assignment of error.

B.

{¶52}   Having concluded that Mr. and Ms. Lee violated R.C. 2921.42, the court determined they should forfeit their employment wages under the faithless servant doctrine.  In the trial court's view, the Lees' involvement with these contracts

constituted a breach of their respective duties of loyalty to VLT, justifying the forfeiture.

**{¶53}** " '[T]he "faithless servant doctrine" is a recognized rule of law in the state of Ohio which requires a disloyal and deceitful employee to forgo his compensation during such period of "faithlessness." ' " *Fin. Dimensions, Inc. v. Zifer*, 1st Dist. Hamilton Nos. C-980960 and C-980993, 1999 WL 1127292, *8 (Dec. 10, 1999), quoting *Roberto v. Brown Cty. Gen. Hosp.*, 59 Ohio App.3d 84, 86, 571 N.E.2d 467 (12th Dist.1989). " ' "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." ' " *Id.*, quoting *Roberto* at 86, quoting 2 Restatement of the Law 2d, Agency, Section 469 (1958). In other words, if an agent "acts adversely to his employer in any part of the transaction or omits to disclose any interest which would naturally influence his conduct * * *, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services." (Internal quotations omitted.) *Id.*

**{¶54}** On appeal, Mr. and Ms. Lee do not seriously challenge the substance of the trial court's conclusion that they breached their respective duties of loyalty. Instead, they first repackage their standing argument—urging that the attorney general could not bring this claim because it did not flow from a finding for recovery. We already rejected that argument above, and similarly do so here.

**{¶55}** Mr. and Ms. Lee alternatively argue that the trial court failed to cite any authority affirming that the attorney general may bring a *faithless servant* claim.

27

But as we have already noted, the General Assembly granted the attorney general broad authority to "secure compliance with the laws, ordinances, rules, and orders pertaining to any public office, and enforce generally the laws relating to the expenditure of public funds." R.C. 2921.42. For many of the reasons we discussed above, the scope of this statutory provision is sufficiently broad to encompass a faithless servant claim. The public policy behind the faithless servant doctrine is that an employee cannot be compensated for his own deceit or wrongdoing. *Roberto*, 59 Ohio App. 3d at 86, 571 N.E.2d 467. Furthermore, Mr. and Ms. Lee do not suggest in this appeal that their status as public employees somehow exempts them from this doctrine. In light of the statutory scope of R.C. 2921.42, absent some controlling authority to the contrary, we cannot say that the trial court erred by finding that Mr. and Ms. Lee breached their respective duties of loyalty and should forfeit the wages they received during their unfaithfulness. We therefore overrule the Lees' sixth assignment of error.

## C.

{¶56} We now turn to the trial court's determination that Mr. and Ms. Lee were jointly and severally liable for triple the value of the CEED contracts, under the OCPA. The OCPA provides, in pertinent part: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * * ." R.C. 2923.32(A)(1). "Enterprise" is defined as including "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). "Corrupt activity" encompasses many

state and federal offenses, but as relevant here, it includes "engaging in * * * [c]onduct constituting * * * [a] violation of section * * * 2921.42." R.C. 2923.31(I), (I)(2), (I)(2)(a). And finally, a "pattern of corrupt activity" means "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶57} Assuming the existence of an OCPA violation, the statutory scheme also provides for civil damages. R.C. 2923.34(A) permits "[a]ny person who is injured * * * by [an OCPA] violation * * * [to] institute a civil proceeding." And for purposes of the statute, "person" encompasses "an individual, corporation, business trust, estate, trust, partnership, and association," R.C. 1.59(C); and "any governmental officer, employee, or entity." R.C. 2923.31(G), referencing R.C. 1.59. Finally, if the plaintiff "prove[s] the violation * * * and actual damages by clear and convincing evidence," the plaintiff may "recover triple damages." R.C. 2923.34(E).

{¶58} On appeal, Mr. and Ms. Lee present three challenges to the trial court's judgment: (1) whether repeated violations of the same statute can constitute an OCPA violation; (2) whether the CEED contracts constituted a "pattern"; and (3) whether they participated in the affairs of an enterprise. Ultimately, we conclude that the Lees' second argument—that the CEED contracts were not a pattern—has merit and reverse on that ground, obviating our need to address the other two.

{¶59} As already noted, a "pattern of corrupt activity" means "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). Here, the attorney

general urges us to apply the statute in simple terms: that the Lees committed two or more violations of R.C. 2921.42 related to the affairs of VLT. In essence, the attorney general asks us to endorse a minority view held by some federal courts interpreting a federal counterpart, and conclude "that a single scheme involving several underlying, unlawful acts, is sufficient to demonstrate a pattern." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 33 (10th Dist.) (finding the minority view "contrary to Ohio case law"). Ultimately, we conclude that the attorney general's approach disregards the General Assembly's intent to preclude multiple corrupt acts from constituting a pattern where "they constitute a single event." *See* R.C. 2923.31(E) (precluding a pattern where multiple acts are "so closely related to each other * * * that they constitute a single event."). Through this language, the General Assembly conveyed its desire not to apply the OCPA too broadly, lest it transform any transgression into a pattern of corrupt activity.

{¶60} The General Assembly patterned OCPA after its federal counterpart, the Racketeer Influenced and Corrupt Organizations Act (RICO), Section 1961, Title 18, U.S. Code. *Morrow* at ¶ 26. And the declared purpose of RICO was " 'to seek the eradication of organized crime in the United States.' " *United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), quoting Organized Crime Control Act of 1970, Statement of Findings and Purpose, 84 Stat. 92. In contrast to RICO, "[t]here is little legislative history regarding the [OCPA]." *State v. Schlosser*, 79 Ohio St.3d 329, 333, 681 N.E.2d 911 (1997). Nevertheless, Ohio courts have concluded that its purpose is similar. *See, e.g., State v. Hughes*, 2d Dist. Miami No. 90-CA-54, 1992 WL 52473, *8 (Mar. 13, 1992) (quoting the purpose for RICO to

30

interpret the OCPA). Furthermore, the Ohio Supreme Court has affirmed that RICO and the OCPA "were enacted to punish the enterprise and those controlling the enterprise, not the petty criminals." *State v. Stevens*, 139 Ohio St.3d 247, 2014-Ohio-1932, 11 N.E.3d 252, ¶ 15. "[N]either statute intended to make a situation such as three robberies committed by the same person a RICO violation. Instead, while slightly different in definition, both statutes attempt to prohibit an *enterprise*." (Emphasis in original.) *Schlosser* at 334.

**{¶61}** With this purpose in mind, we return to the issue of applying the meaning of "pattern." And in resolving this, we find guidance from the Tenth District's decision in *Morrow*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696. The *Morrow* court considered whether repeated acts of perjury during a seven-year lawsuit constituted a pattern for purposes of the OCPA. *Id.* at ¶ 34. And to guide its analysis, the *Morrow* court adopted a multifactor test from the Sixth Circuit Court of Appeals.

> "To state the inquiry simply, a pattern is the sum of various factors including: the length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); the number of victims (the more the better); and the number of perpetrators (the less the better)."

*Morrow* at ¶ 34, quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir.1995).

**{¶62}** Applying this test, the Tenth District concluded that the acts of perjury did not constitute a pattern. *Id.* The subject matter of the statements was the same, it caused a single type of harm, and it involved the same perpetrators and victim. *Id.* Thus, the court concluded: " ' "Where there is only one purpose, one result, one set of participants, one victim, and one method of commission, there is no continuity and therefore no pattern." ' " *Id.*, quoting *B.J. Skin & Nail Care*, 641 F.Supp. 563, 566 (D.Conn.1986), quoting *Torwest DBC, Inc. v. Dick*, 628 F.Supp. 163, 166 (D.Colo.1986). We similarly find the *Morrow* test instructive and adopt it here.

**{¶63}** Applying *Morrow* to this case, we conclude that the CEED contracts do not constitute a pattern as a matter of law. The attorney general fixates on the fact that there were six separate illegal contracts. But a closer look shows that they might as well have been one contract on automatic renewal—they all sing the same song. The 2008 contract provided janitorial/repair services for two buildings, and the 2009 contract provided the same services, for the same two buildings, at the same price. The 2010 and 2011 contracts likewise mirror the first two, except that they include two additional buildings (recently acquired by VLT). And an additional 2011 contract simply adds one more building that VLT acquired, receiving the same services, with an identical contractual structure and substance. Finally, the last contract, in 2013, simplified matters by covering all the buildings at a flat rate instead of dividing the cost of each building. In other words, these six contracts covered the same subject matter (provision of janitorial/repair services), used nearly verbatim language, and had nearly identical pricing structures. The distinguishing feature is that, as it acquired more buildings, the contracts were modified to reflect VLT's growth. But even then, the per-building cost largely remained constant.

**{¶64}** Filtering these facts through the *Morrow* test, our conclusion is rather straightforward. There was only one scheme (to contract with VLT and receive public funds from it), one variety of predicate acts within the scheme (a self-interested contract), one type of injury (misappropriated public funds), one victim (VLT), and one set of perpetrators (Mr. and Ms. Lee). The contracts used virtually identical language and carried forward a similar pricing structure from year to year. We see no material difference between this arrangement and a single contract with an automatic renewal clause (perhaps with an evolving schedule of buildings). Nor do we find any distinguishing factor between this scheme and the series of perjurious statements in *Morrow*. As a result, for purposes of the OCPA, the CEED contracts represented a "single event" and did not constitute a pattern consistent with *Morrow*. We therefore sustain the Lees' seventh assignment of error and reverse the trial court's judgment with respect to the OCPA.

IV.

**{¶65}** Having addressed the claims against both Mr. and Ms. Lee, we now turn to the claim brought solely against Ms. Lee—strict liability. The trial court determined that Ms. Lee's position as superintendent provided additional liability, namely strict liability under R.C. 9.39, for both the contracts with CEED and her daughter.

**{¶66}** "That public officials are liable for the public funds they control is firmly entrenched in Ohio law." *Cordray*, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, at ¶ 12. The General Assembly codified this very principle in R.C. 9.39, which provides: "All public officials are liable for all public money received or collected by them or by their subordinates under color of office." Here, the trial

33

court found Ms. Lee "strictly liable for all disbursements of VLT's funds that were not authorized by statute" because she was a signatory and authorized user of VLT's bank account.

{¶67} We have already determined that the CEED contracts violated R.C. 2921.42(A)(4). As to the daughter's contracts, the trial court held that Ms. Lee had a personal interest because she was a co-owner of the bank account where VLT directed the payments. For her part, Ms. Lee does not contest the trial court's determination that she had an illegal interest in her daughter's contracts. Nor does she contest the court's finding that she was a public official or that she received public funds under color of office. Instead, Ms. Lee disputes any liability in the first place because of the absence of a finding for recovery (tying back to arguments we've already addressed).

{¶68} Of course, R.C. 9.39 contains no language suggesting that a public official is strictly liable only pursuant to a finding for recovery. Nonetheless, Ms. Lee seizes upon *In re Scott*, 566 B.R. 471 (Bankr.N.D.Ohio 2017) to create such a limitation. In *Scott*, a debtor operated two community schools and the state auditor found that the debtor had mishandled more than $1 million in public funds. *Id.* at 473. The attorney general sued to recover the misappropriated funds under R.C. 9.39, and objected to any discharge of the debt. *Id.* As relevant here, the alleged liabilities were the result of both a finding for recovery (pursuant to R.C. 117.28) and additional investigations. *Id.* at 478. And while the bankruptcy court granted summary judgment for liabilities arising from the finding for recovery, the court denied summary judgment for liabilities arising from the additional investigations. *Id.* at 478–79.

34

**{¶69}** The court concluded that summary judgment was appropriate for only the liabilities arising from the finding for recovery because, per the statute, such a finding is "prima facie evidence in determining the truth of the allegations." *Id.* at 476, quoting R.C. 117.36. And critically, the debtor had offered no evidence to rebut that presumption. *Id.* In contrast, the bankruptcy court reasoned that summary judgment was inappropriate for the alleged liabilities arising from the additional investigations because liability had not actually been established. *Id.* at 479. The court explained: "These [additional] findings do not determine liability for the loss of public funds, which is a prerequisite to holding the debtor accountable under the strict liability theory." *Id.* Ms. Lee hangs her hat on this last sentence, arguing that the court held that the debtor was not strictly liable because liability was not based on a *finding for recovery*. That is simply not the case. Instead, the court explained that questions of fact remained as to liability; and *liability* is a prerequisite to strict liability theory.

**{¶70}** Unlike in *Scott*, liability is not at issue here because we have already determined that liability exists for the CEED contracts. And Ms. Lee does not contest liability for her daughter's contracts. Thus, the trial court appropriately held Ms. Lee strictly liable under R.C. 9.39 for the amounts of VLT's contracts with CEED and her daughter. We therefore overrule the Lees' third assignment of error.

V.

**{¶71}** We finally turn to the Lees' fifth assignment of error, which challenges the trial court's determination that Ms. Harris (Ms. Lee's daughter) is jointly and severally liable for the amount of her employment contracts. As already noted, the trial court held that Ms. Harris's contracts violated R.C. 2921.42 because Ms. Lee had

35

a personal interest by being a co-owner on the bank account receiving the payments. Ms. Harris does not challenge that holding. We note, however, that there was no allegation that *Ms. Harris* violated R.C. 2921.42. Nonetheless, the trial court determined that she must return her wages under her employment contracts for two independent reasons.

{**¶72**} First, the trial court concluded that Ms. Harris was liable under subsection (H) of R.C. 2921.42. It provides: "Any public contract in which a public official, a member of the public official's family, or any of the public official's business associates has an interest in violation of this section is *void and unenforceable.*" (Emphasis added.) R.C. 2921.42(H). And the trial court reasoned: "Courts of last resort construing statutes making such conflicted contracts 'void' consistently hold that public funds paid pursuant to those contracts can be recovered from the recipient." *Sun Bldg. Ltd. Partnership v. Value Learning & Teaching Academy*, Hamilton C.P. No. A-1404504, 2018 WL 1678061 (Mar. 26, 2018), citing *Arthur v. Trindel*, 168 Neb. 429, 96 N.W.2d 208, 210 (1959); *Sioux Falls Taxpayers Assn. v. City of Sioux Falls*, 69 S.D. 93, 7 N.W.2d 136, 140 (1942); *City of Bangor v. Ridley*, 117 Me. 297, 104 A. 230, 231 (1918); *Indep. School Dist. No. 5 v. Collins*, 15 Idaho 535, 98 P. 857, 858 (1908). Second, the trial court alternatively held that Ms. Lee's daughter was liable under R.C. 2307.60(A)(1). That provision provides that "[a]nyone injured in person or property by a *criminal act* has, and may recover full damages in, a civil action unless specifically excepted by law * * * ." (Emphasis added.) R.C. 2307.60(A)(1). Thus, the trial court concluded that VLT could recover full damages because having an interest in a public contract is a criminal act under

R.C. 2921.42(A)(4). *See* R.C. 2921.42(E) ("Violation of division (A)(3), (4), or (5) of [R.C. 2921.42] is a misdemeanor of the first degree.").

{¶73} Regarding the trial court's second holding, we need not address this issue because Ms. Harris does not meaningfully challenge the trial court's first basis for permitting recovery: that parties receiving public funds pursuant to a void contract must return those payments. In their merit brief, the Lees argue only that the cases relied upon by the trial court were inapplicable because they "are all old cases from other states and involve municipalities." They neglect to explain why the vintage of those cases or their context renders them inapplicable here. App.R. 16(A)(7) requires appellants to provide "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Here, the Lees' assertion that the trial court relied on inapplicable cases is one sentence long, engages in no analysis, and fails to cite a single authority. *See State v. Hale*, 7th Dist. Monroe No. 04 MO 14, 2005-Ohio-7080, ¶ 10 (disregarding an assignment of error because the appellant's argument was "only five sentences long and contain[ed] no citations to any authority"). We therefore overrule the Lees' fifth assignment of error for failure to advance a legal argument.

\*       \*       \*

{¶74} In light of the foregoing analysis, we overrule the Lees' first, third, fourth, fifth and sixth assignments of error. We decline to address their second assignment of error as moot in light of our disposition. Finally, we sustain the Lees' seventh assignment of error regarding the OCPA claim and remand for entry of

judgment in the Lees' favor with respect to the OCPA claim.     When the trial court recalculates damages to eliminate the OCPA damages, it should correct any typographical or mathematical errors in calculation previously made.

Judgment accordingly.

**ZAYAS, P. J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion